IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-02707-PAB-MDB

COLORADO FIRE SPRINKLER, INC.,

      Plaintiff,

v.

NATIONAL AUTOMATIC SPRINKLER INDUSTRY PENSION FUND, and
TRUSTEES OF THE NATIONAL AUTOMATIC SPRINKLER INDUSTRY PENSION
FUND,

      Defendants.

---

**ORDER**

---

This matter is before the Court on plaintiff Colorado Fire Sprinkler, Inc.'s Motion
for Summary Judgment [Docket No. 41] and Defendants' Cross Motion for Summary
Judgment [Docket No. 47].   The parties filed responses, Docket Nos. 48, 51, and
replies.   Docket Nos. 50, 53.   The Court has subject matter jurisdiction under 28
U.S.C. § 1331 and 29 U.S.C. § 1132(e).

## I. BACKGROUND

This lawsuit stems from an arbitrator's award in favor of defendants.   Plaintiff
Colorado Fire Sprinkler, Inc. ("CFS") is a contractor that installs and services fire
sprinkler systems in commercial properties in Colorado.   Docket No. 47 at 2, ¶ 24.[1]

---

[1] The following facts are drawn from the undisputed facts in the parties' briefing.   *See*
Practice Standards (Civil case), Chief Judge Philip A. Brimmer, § III.F.3.b.   The parties
have urged the prior proceedings of record in this case and, where necessary, the Court
takes judicial notice of the contents of the related decisions as reflected below.   *See*
Fed. R. Evid. 201.

Defendant National Automatic Sprinkler Industry Pension Fund (the "Fund") is a multiemployer pension plan.   Docket No. 41 at 3, ¶ 1.   Plaintiff alleges, and defendants admit, that Trustees of the National Automatic Sprinkler Industry Pension Fund (the "Trustees") are the duly appointed trustees of the Fund.   Docket No. 1 at 4, ¶ 13.

Starting in 1994, CFS made contributions to the Fund under a collective bargaining agreement with the Road Sprinkler Fitters Union (the "Union").   Docket No. 41 at 3, ¶ 1.   On March 31, 2013, the latest collective bargaining agreement between CFS and the Union expired.   *Id.*, ¶ 2.[2]   CFS and the Union then engaged in a protracted legal dispute.   *Id.*, ¶ 3.

In 2013, the Union filed an unfair labor practice grievance with the National Labor Relations Board ("NLRB").   *Colorado Fire Sprinkler, Inc. v. N.L.R.B.*, 891 F.3d 1031, 1034 (D.C. Cir. 2018).   A central dispute before the NLRB was whether the collective bargaining agreements were subject to Section 8(f) of the National Labor Relations Act, which applies specifically to labor agreements in the construction and building industries, or if the agreements were instead subject to Section 9(a), which applies generally to other labor agreements.   *Id.*   If Section 8(f) applied, then CFS was entitled to immediately withdraw from the collective bargaining agreements with the Union.   *Id.* at 1035; 29 U.S.C. § 158(f).   If Section 9(a) applied instead, then CFS was required to maintain the status quo while attempting to negotiate a new agreement, including making contributions to the Fund.   *N.L.R.B.*, 891 F.3d. at 1035; 29 U.S.C. § 159(a).

---

[2] In an apparent typographical error, CFS's motion listed this date as March 30, 2013, Docket No. 41 at 3, ¶ 2; however, elsewhere in its briefing CFS consistently used the March 31, 2013 date agreed to by defendants.   *E.g.*, Docket No. 41 at 15. Accordingly, the date is undisputed.

The administrative law judge ("ALJ") ruled in favor of the Union, holding that the final collective bargaining agreement was subject to Section 9(a).   *Colorado Fire Sprinkler Inc. and Road Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO*, 364 N.L.R.B. No. 55, at 1 (2016).   The NLRB affirmed the relevant portion of the ALJ's decision, holding that the agreement was subject to Section 9(a).   *Id.*   CFS petitioned the United States Court of Appeals for the District of Columbia Circuit to review the NLRB decision. *N.L.R.B.*, 891 F.3d at 1037.

On June 8, 2018, the D.C. Circuit reversed, holding that the final collective bargaining agreement was a Section 8(f) pre-hire agreement.   *Id.* at 1041.   The D.C. Circuit remanded the case to the NLRB, where the case was dismissed.   *Colorado Fire Sprinkler, Inc.,* No. 27-CA-115977 and 27-CA-120823, 2019 WL 1359078, at *1 (N.L.R.B. Mar. 25, 2019).

"If an employer withdraws from a multiemployer plan," such as the Fund, "it incurs 'withdrawal liability' in the form of 'a fixed and certain debt to the pension plan.'" *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 609 (1993) (quoting *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984)).   "An employer's withdrawal liability is its 'proportionate share of the plan's unfunded vested benefits,' that is, 'the difference between the present value of vested benefits' (benefits that are currently being paid to retirees and that will be paid in the future to covered employees who have already completed some specified period of service, 29 U.S.C. § 1053) 'and the current value of the plan's assets.'"   *Id.* (quoting 29 U.S.C. §§ 1381, 1391).   "Withdrawal liability is assessed in a notification by the 'plan sponsor' (here the [T]rustees, *see* § 1301(a)(10)(A)) and a demand for payment."   *Id.* at

3

610 (citing 29 U.S.C. § 1399(b)).

Shortly after the D.C. Circuit's ruling, the Fund served a notice of withdrawal liability on CFS dated June 25, 2018.   Docket No. 41 at 3, ¶ 5; Docket No. 41-4 (notice).   The Fund asserted that CFS had withdrawn from the Union on March 31, 2013, the date that CFS's obligations to make contributions under the collective bargaining agreement expired under the D.C. Circuit's ruling.   Docket No. 41 at 3, ¶ 6. The methods of determining the amount of withdrawal liability are set by statute.   While the Pension Benefit Guarantee Corporation ("PBGC") is authorized to promulgate regulations governing the actuarial assumptions under 29 U.S.C. § 1393(a), it has not done so.   Docket No. 29 at 3, 9.   By statute, withdrawal liability must be "determined by each plan on the basis of—(1) actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan."   29 U.S.C. § 1393(a)(1).   "The plan's actuary, who is subject to regulatory and professional standards, 29 U.S.C. §§ 1241, 1242; 26 U.S.C. § 7701(a)(35), must determine the present value of the plan's liability for vested benefits."   *Concrete Pipe,* 508 U.S. at 609.

In determining CFS's withdrawal liability, the Fund's actuary testified that he used a so-called "Segal Blend" by blending the discount rate based on an expected 7.5% annual return and the rates for purchasing annuities published by the PBGC for certain portions of the Fund's assets.   Docket No. 47 at 4, ¶ 31.   As explained by the Fund's actuary:

> To the extent that the present value of vested benefits is matched by the market value of plan assets on hand: interest assumptions prescribed by

> the Pension Benefit Guaranty Corporation under 29 CFR Chapter XL, Part
> 4044 that are in effect for the applicable withdrawal liability valuation date
> are used.   Applicable PBGC Interest Rates as of December 31, 2012:
> > Select rate for 20 years          3.07%
> > Ultimate rate after 20 years     3.00%
> To the extent the vested benefits are not matched by plan assets (at
> market value), the interest assumption is the same as used for plan
> funding as of the next January 1 following the date of this valuation:
> 7.50%.

*Id*. at 5, ¶ 32 (quoting Docket No. 41-6 at 14).   In other words, the actuary used the

higher 7.5% rate that the Fund uses to determine if it has met its funding requirements

for a portion of the calculation and the lower 3% or 3.07% PBGC rates for another

portion of the calculation.   In this case, the Segal Blend resulted in an effective discount

rate of 4.8% applied to the overall liability.   Docket No. 41 at 4, ¶ 12.

The actuary's decision to use a Segal Blend instead of using the 7.5% rate used

for other purposes increased the calculated withdrawal liability.   The Fund's notice of

withdrawal liability based on the Segal Blend required CFS to pay $1,815,565.00

through a series of sixty-two payments.   Docket No. 47 at 3, ¶ 26; *see also* Docket No.

41-4 at 3.   By contrast, CFS's expert calculated that using the 7.5% rate would result in

a withdrawal liability of $610,000.   Docket No. 41 at 6, ¶ 23.

CFS initiated an arbitration concerning its withdrawal liability, which arbitration

used the American Arbitration Association's Multiemployer Pension Plan Arbitration

Rules for Withdrawal Liability Disputes.   *Id*. at 4, ¶ 8.   CFS challenged the Segal Blend

method and asserted that, instead, its liability should be calculated using the 7.5%

discount rate.   *Id*. at 6, ¶ 23.   Such arbitrations are subject to a statutory burden

shifting framework under which the withdrawing party, here CFS, bears the burden of

showing that the Fund's determinations of withdrawal liability are incorrect.   The

relevant provision, 29 U.S.C.

§ 1401, provides:

> In the case of the determination of a plan's unfunded vested benefits for a plan year, the determination is presumed correct unless a party contesting the determination shows by a preponderance of evidence that—
> (i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or
> (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.

29 U.S.C. § 1401(a)(3)(B).

The arbitrator issued two rulings, one on February 10, 2021, and another on September 7, 2021.   Docket No. 41 at 4, ¶ 11; Docket Nos. 41-6, 41-7.   In the first ruling, the arbitrator affirmed that March 31, 2013 was the correct date for withdrawal, rejected CFS's laches defense, and held that it was legally permissible for the Fund actuary to rely on different assumptions for determining adequate funding and determining withdrawal liability.   Docket No. 41 at 4, ¶¶ 12-13; Docket No. 41-6 at 8, 13, 20.   The arbitrator ordered a hearing to resolve whether the Fund actuary's assumptions were reasonable.   Docket No. 47 at 4, ¶ 29; Docket No. 41-6 at 20-21.

The Fund's actuary, Mr. Eli Greenblum, testified at the hearing.   Docket No. 47 at 4, ¶ 30.   He said that he personally selected the Segal Blend method and that the Fund's Trustees did not ask him to use that method.   *Id*. at 5, ¶ 33.   Mr. Greenblum testified that he always used a Segal Blend in calculating employer withdrawal liability for the Fund.   *Id*. at 4, ¶ 31.   Mr. Greenblum used the Segal Blend discount rate method for the calculation of CFS' withdrawal liability because that method represented his "'best estimate of anticipated experience under the plan' for purposes of withdrawal liability."   *Id*.   As to his anticipated experience under the plan, he testified that

6

"anticipated experience under the plan, for the purposes of withdrawal liability, includes the fact that the employer will no longer be in the plan. . . .   There is no funding other than their payment of withdrawal liability payments, and that [ ] is my anticipated experience, under the plan."   Docket No 1-2 at 9; *see also* Docket No. 53-4 at 36, 139:5-15 (May 24, 2021 transcript from arbitration hearing).

In his second ruling, the arbitrator concluded that "CFS failed to show by a preponderance of the evidence that the actuarial methods and assumptions used to calculate its withdrawal liability were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations)."   Docket No. 41-7 at 23; Docket No. 47 at 5, ¶ 35.   In reaching this conclusion, the arbitrator found that Mr. Greenblum appropriately relied on Actuarial Standard of Practice No. 27 ("ASOP 27") in choosing to use a Segal Blend to calculate CFS's withdrawal liability.   Docket 1-2 at 18 ("Mr. Greenblum used the PBGC interest rate, which is derived from annuity prices, to calculate a market rate settlement value for UVBs [unfunded vested benefits] matched by plan assets.   ASOP 27 Section 3.9.b explicitly authorizes that method to measure the settlement value of those UVBs.").   The arbitrator also agreed with Mr. Greenblum that withdrawal liability calculation is a "one-time settlement of the obligations of the employer leaving the plan and a transfer of risk to the remaining employers.   The market rate for transferring that risk can be approximated using a discount rate derived from PBGC annuity data.   It reflects what an insurer would charge to take the risk the withdrawing employer is transferring to the Fund."   *Id*. at 20-21.   In addition, the arbitrator's ruling stated that he filed his oath and that information about the hearings could be found in the transcripts, including the "place, time, and date of the hearings, as

7

well as the presence of counsel and the parties." Docket No. 47 at 5-6, ¶ 36; Docket No. 41-7 at 3 n.1; Docket No. 47-4 at 15 (listing appearances at hearing). The arbitrator issued an award requiring payment of the asserted withdrawal liability. Docket No. 41-7.

Section 4221 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1401, provides: "[u]pon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action, no later than 30 days after the issuance of an arbitrator's award, in an appropriate United States district court in accordance with section 1451 of this title to enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2). On October 6, 2021, CFS filed its complaint requesting that the Court vacate the award on four bases styled as separate claims: (1) that the Fund's actuary's use of the Segal Blend was unlawful and unreasonable, (2) that laches barred the Fund from seeking withdrawal liability, (3) that the Fund was relying on the incorrect date of withdrawal, and (4) that procedural errors during the arbitration violated the operative rules. Docket No. 1. The parties have filed cross-motions for summary judgment. *See* Docket Nos. 41, 47. CFS argues that it is entitled to judgment as a matter of law on all issues raised in the complaint. Docket No. 41. Defendants seek summary judgment only on the first issue, whether CFS has shown that the actuary's determination of withdrawal liability rested on unreasonable assumptions. Docket No. 47.

**II. LEGAL STANDARDS**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).   A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001).   Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).   An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.   *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted).   "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).   The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted).   "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."   *Bausman*, 252 F.3d at 1115.   When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.   *Id.*   Cross-motions for summary judgment

9

must be viewed separately, and the denial of one does not necessitate the granting of the other.   *United States v. Supreme Court of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016) (citations omitted).

As noted above, the underlying arbitration proceedings are subject to a burden shifting framework that places the burdens on the employer, CFS, to overcome presumptions in favor of the actuary's determinations.   Similarly, the Court's review of the arbitrator's award is subject to a burden shifting framework under which "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct."   29 U.S.C. § 1401(c).   When reviewing an arbitrator's legal conclusions, a *de novo* standard applies.   *N.Y. Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund*, 303 F. Supp. 3d 236, 247 (S.D.N.Y. 2018).   An arbitrator's decisions relating to discount rates and actuarial methods are a "mixed question of law and fact" that are reviewed under a "clearly erroneous" standard.   *Id*. at 255; *Manhattan Ford Lincoln, Inc. v. UAW Loc. 259 Pension Fund*, 331 F. Supp. 3d 365, 379 (D.N.J. 2018).   For reversal to be appropriate under the clearly erroneous standard, the undisputed evidence must leave a court with a "definite and firm conviction that a mistake has been committed."   9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2585 (3d ed. 2023) (citing *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

III.   **ANALYSIS**

A.  **Whether the Actuarial Assumptions Were Unreasonable**

CFS seeks summary judgment on the issue of whether the Fund actuary's use of the Segal Blend was unlawful and unreasonable, arguing that caselaw prohibits the use

of the Segal Blend method for calculating withdrawal liability and, instead, requires that the rates used be similar.   Docket No. 41 at 7.   Defendants seek summary judgment on the same issue, arguing that the use of the Segal Blend is not *per se* unreasonable and that its use in these circumstances was reasonable.   Docket No. 47 at 9.

### 1.  Rate Similarity

CFS asserts that the "rate used for calculating the withdrawal liability should be the same or similar to the one Defendant used to calculate its minimum funding requirements, 7.5%."   Docket No. 41 at 9.   CFS argues that the difference between the 7.5% discount rate used to determine minimum funding requirements and the 4.8% blended rate used to calculate withdrawal liability violated a requirement that the discount rates used must be "similar."   *Id*. at 12.   CFS claims that caselaw interpreting 29 U.S.C. § 1393, including *Concrete Pipe* and *United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co.*, 39 F.4th 730, 736 (D.C. Cir. 2022), requires that the rate used to calculate withdrawal liability be similar to the rate used to calculate whether the Fund meets its minimum funding requirements.   Docket No. 41 at 10-12. CFS asserts that the 4.8% blended rate is "artificially low" in comparison to the "7.5% rate used to calculat[e] the minimum funding requirements."   *Id*. at 12.

Defendants reject any requirement that the rates used be similar and argue that no such requirement is supported by *Concrete Pipe*.   Docket No. 48 at 6.   They urge the Court not to follow the caselaw from the courts of appeals cited by CFS, both because it creates an unworkable standard and because the cases are distinguishable. *Id*. at 6-13.   Defendants claim that the "Segal Blend approach has been broadly accepted upon review because of the recognition that the statute affords actuaries

discretion to use their professional judgment in keeping with actuarial practice."   Docket No. 47 at 9.   Defendants assert that deference to the actuary's judgment here is consistent with the Supreme Court's decision in *Concrete Pipe* and with recent guidance from the PBGC in proposed rulemaking on this issue.   Docket No. 48 at 10 & n.3; *see also Actuarial Assumptions for Determining an Employer's Withdrawal Liability*, 87 Fed. Reg. 62316 (Oct. 14, 2022) ("PBGC Rulemaking").

The statutory language prescribing both the means of determining withdrawal liability and the review of such determinations relates to the actuarial assumptions and whether those assumptions are reasonable.   29 U.S.C. §§ 1391(a), 1401(b).   Neither provides for comparison of the rates themselves.

*Concrete Pipe* remains the leading Supreme Court decision addressing this statutory scheme; however, the issue presented was whether the associated burden shifting scheme violated constitutional due process protections.   *Concrete Pipe*, 508 U.S. at 615.   In considering this question, *Concrete Pipe* did not address the issue presented by CFS, namely, whether the rate used to calculate withdrawal liability must be similar to the rate used by funds for other purposes.   Instead, consistent with the statute, it considered whether the actuarial assumptions used for different purposes could be different.   *Id*. at 632-34.   In particular, the Supreme Court considered whether actuaries would use different actuarial assumptions for the improper purpose of punishing withdrawing employers:

> As the text plainly indicates, the assumptions and methods used in calculating withdrawal liability are selected in the first instance not by the trustees, but by the plan actuary.   For a variety of reasons, this actuary is not, like the trustees, vulnerable to suggestions of bias or its appearance. Although plan sponsors employ them, actuaries are trained professionals subject to regulatory standards.   *See* 29 U.S.C. §§ 1241, 1242; 26 U.S.C.

§ 7701(a)(35).   The technical nature of an actuary's assumptions and methods, and the necessity for applying the same assumptions and methods in more than one context, as a practical matter limit the opportunity an actuary might otherwise have to act unfairly toward the withdrawing employer.   The statutory requirement (of "actuarial assumptions and methods—which, in the aggregate, are reasonable . . .") is not unique to the withdrawal liability context, for the statute employs identical language in 29 U.S.C. § 1082(c)(3) to describe the actuarial assumptions and methods to be used in determining whether a plan has satisfied the minimum funding requirements contained in the statute.   The use of the same language to describe the actuarial assumptions and methods to be used in these different contexts tends to check the actuary's discretion in each of them.

*Id*. at 632–33.   The Supreme Court acknowledged that use of different actuarial assumptions could be used as a basis to attack determinations of withdrawal liability, but also acknowledged that there may be actuarial assumptions unique to withdrawal liability that do not apply in other contexts.   *Id*. at 633.   Contrary to CFS's arguments, nowhere does *Concrete Pipe* suggest or require that the rates used for minimum funding and withdrawal liability calculations be similar.

CFS's argument regarding similarity finds better support in *Energy West*. Docket No. 41 at 11.   The employer in *Energy West* argued that the rates used for determining minimum funding and withdrawal liability must be the "same or very similar," but the D.C. Circuit rejected this standard in favor of a looser correspondence. *Energy West,* 39 F.4th at 736.   The court concluded that its "holding" that "discount rates used to calculate minimum funding and withdrawal liability must be *similar* accords perfectly with *Concrete Pipe*, because both rates must be the actuary's 'best estimate of anticipated experience under the plan.'"   *Id*. at 743.   The D.C. Circuit reached this conclusion based on differences in the actuarial assumptions used.   *Id*. at 741.   The court observed that, although the statutes prescribing the actuarial assumptions that

must be used in determining whether a fund meets its minimum funding requirements and those used in determining withdrawal liability had been amended since *Concrete Pipe* was decided, the statutes still used similar language to prescribe the actuarial assumptions.   *Id*. at 742.   The D.C. Circuit held that the actuarial assumptions used in the two circumstances "need not be identical but must be similar because they both must be 'the actuary's best estimate of anticipated experience under the plan.'"   *Id*. at 741.   The court vacated the arbitrator's ruling "because in determining the withdrawal liability for Energy West, the actuary failed to use a discount rate that reflected the Plan's characteristics and was the 'best estimate of anticipated experience under the plan.'"   *Id*.

It does not appear that other courts have applied the rate similarity analysis suggested in *Energy West*.   The two cases cited by CFS, *GCIU-Emp. Ret. Fund v. MNG Enterprises, Inc.*, 51 F.4th 1092, 1100 (9th Cir. 2022), and *Employees' Ret. Plan of Nat'l Educ. Ass'n v. Clark Cnty. Educ. Ass'n*, 664 F. Supp. 3d 24, 43 (D.D.C. 2023), each turn on whether the arbitrator's assumptions were reasonable considering the plan experience, rather than a comparison of the rates.   *See* Docket No. 41 at 11-12. Because the rate similarity analysis in *Energy West* did not form the basis for the court's ruling and the court provided no framework for evaluating whether two rates are sufficiently similar, the Court declines to apply a rate similarity standard here.   Instead, consistent with the statutory language, the Court will look to whether CFS has shown that the actuarial assumptions were unreasonable.   29 U.S.C. §§ 1391(a), 1401(b).

### 2.  *Reasonableness of the Fund Actuary's Assumptions*

CFS argues that the Fund actuary's use of the Segal Blend was unreasonable

because it does not represent actuary's "'best estimate' of the actual Fund performance." Docket No. 41 at 13. CFS claims that it was improper for the actuary to use PBGC's rates for purchasing annuities, which are "rate[s] used for riskless investments." *Id*. at 9. CFS argues that that the actuary's use of the Segal Blend rate is unreasonable as a matter of law by analogy to three cases where it asserts "the same facts are present." *Id*. at 14. CFS states that defendants' "selective use of the Segal Blend is improper" for the same reasons in the other cases where the Segal Blend rate was found not to be the "'best estimate' of the Fund's anticipated performance." *Id*. at 14-15.

CFS first cites *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346 (7th Cir. 2012). Docket No. 41 at 13. That fund's board directed its actuary to change the way that the fund calculated both its minimum funding and withdrawal liability to whichever rate was the higher of the Segal Blend rate and funding rate. *Chicago Truck Drivers,* 698 F.3d at 355. This change was made for pragmatic reasons unrelated to whether it was the actuary's best estimate. *Id*. at 356. In fact, the actuary acknowledged that it was not his best estimate. *Id*. at 357. The Seventh Circuit held that this decision violated ERISA because it "disregard[ed] a statutory directive, specifically the directive in section 1393(a)(1) that they base their estimate of withdrawal liability on the actuary's 'best estimate' of future fund performance." *Id*.

CFS next cites *Sofco Erectors, Inc. v. Trustees of Ohio Operating Eng'r Pension Fund*, 15 F.4th 407 (6th Cir. 2021). Docket No. 41 at 13-14. There, the Sixth Circuit held that using the "Segal Blend here violate[d] the statute because the resulting

15

interest rate is not 'the actuary's best estimate of anticipated experience under the plan.'" *Sofco Erectors*, 15 F.4th at 421 (quoting 29 U.S.C. § 1393(a)(1)).   The court analyzed the testimony of the actuary, who explained that "the way you settle up a multiemployer pension plan is . . . by doing an annuity purchase on behalf of all the participants, and the interest rates published by PBGC approximate annuity purchase rates." *Id*.   The Sixth Circuit found that the actuary erred by "considering a hypothetical mass withdrawal, rather than the 'anticipated experience under the plan,' 29 U.S.C. § 1393(a); by looking to assets that the fund has not indicated it will ever purchase, rather than the fund's actual portfolio." *Id*.

Finally, CFS cites *New York Times*, 303 F. Supp. 3d at 251.   Docket No. 41 at 14.   There, the fund's actuary used a Segal Blend to calculate withdrawal liability, but used a different investment return assumption for all other purposes.   *New York Times*, 303 F. Supp. 3d at 244.   The arbitrator affirmed the use of the Segal Blend for determining withdrawal liability.   *Id*. at 245.   After reviewing related decisions, the court found both that it is not the case that the "use of different interest rates in different contexts is always impermissible as a matter of law" and that "the use of the Segal Blend uniquely in the context of calculating an employer's withdrawal liability is not prohibited as a matter of law."   *Id*. at 254-255.   The court then looked to the specific facts of the case, noting that the actuary testified that the Segal Blend was not his best estimate of how the fund's assets would perform in the long term and that he had used it to calculate withdrawal liability irrespective of the fund's actual assets.   *Id*. at 255.   Based on the "actuary's testimony, combined with the untethered composition of the Segal Blend and paucity of analysis by the Arbitrator," the court vacated the arbitrator's

16

decision on the use of the Segal Blend.   *Id.* at 256.

Defendants support their summary judgment motion[3] primarily with the testimony of the Fund's actuary, Mr. Greenblum.   Docket No. 47 at 4-5, ¶¶ 29-33, 35.   As the arbitrator summarized, the Fund's actuary "testified that the Fund has been assessing withdrawal liability since 2002 and he has always calculated the annual withdrawal liability valuation and individual employer withdrawal liability by employing the Segal Blend approach."   Docket No. 41-7 at 6; *see also* Docket No. 53-4 at 7, 22:20-24;[4] Docket No. 47-4 at 12, 268:21-25.   He further "testified that he personally selected the Segal Blend approach to calculate UVBs under ERISA §4213(a) [and] was not asked or directed by the Trustees to use the Segal Blend."   Docket No. 41-7 at 9.   He explained that "his 'best estimate of anticipated experience under the plan' differed when he determined UVBs for computing withdrawal liability and when he calculated them for minimum funding requirements."   *Id.*   He stated:

> I believe and I've testified to the fact that anticipated experience under the plan, for the purposes of withdrawal liability, includes the fact that the employer will no longer be in the plan, and when they do that calculation of unfunded vested benefits, it is for the situation that applies to the withdrawn employer.   They are no longer part of the process.   There is no funding other than their payment of withdrawal liability payments, and that it is my anticipated experience, under the plan, for the purposes of a withdrawn employer.

*Id.* at 10; *see also* Docket No. 53-4 at 36, 139:5-15.[5]   "When the employer withdraws, it

---

[3] In their response to CFS's motion, defendants focus on CFS's arguments regarding similarity of rates, discussed above.   Docket No. 48 at 6-13.

[4] This portion of the hearing transcript is not included in the summary judgment record, but its content is not disputed.   *See* Docket No. 47 at 4, ¶ 31.

[5] This is not included in the summary judgment record, but its content is undisputed.   *See* Docket No. 47 at 4, ¶ 31.

has no continuing obligation to ensure Fund resources are adequate to pay benefits." Docket No. 41-7 at 10.   "By contrast, the remaining employers 'will have to contribute additional funds to the plan to make up . . . [the] . . . deficit' if investments do not meet the funding rate assumption and Fund resources are not adequate to pay benefits." *Id*.; *see also* Docket No. 47-4 at 13, 298:12-14.   Defendants also raise arguments based on the PBGC's recent proposed rulemaking and argue that it should be accorded interpretive deference.   Docket No. 47 at 10-11.   However, the rulemaking is not final and does not interpret the statute, but rather creates a parallel analytic framework pursuant to the PBGC's authority to prescribe regulations.   *PBGC Rulemaking*; 29 U.S.C. § 1393(a)(2).

Even viewing the facts in the light most favorable to defendants, the Court is left with the definite and firm conviction that the arbitrator erred in finding that the Fund actuary relied on reasonable assumptions reflecting the "actuary's best estimate of anticipated experience under the plan."   *See* 29 U.S.C. § 1393(a)(1); *see also Supreme Court of N.M.*, 839 F.3d at 906-07.

The circumstances and evidence in this case are similar to *Sofco Erectors*.   Mr. Greenblum viewed the "employer's withdrawal liability as a settlement of its obligations to the Fund."   Docket No. 41-7 at 10.   The arbitrator accepted this as Mr. Greenblum's "anticipated experience under the plan."   Docket No. 1-2 at 9.   Mr. Greenblum used the PBGC annuity data to calculate the discount rate as to the UVBs.   The arbitrator, however, does not cite any testimony of Mr. Greenblum that explains why Mr. Greenblum's settlement theory for calculating the withdrawal liability discount rate for UVBs involves any estimation on his part that is informed by Mr. Greenblum's

"anticipated experience under the plan," as opposed to his decision to use an actuarial standard that does not involve plan experience but instead involves an assumption that the PBGC rate should apply to all UVB withdrawal liability calculations.   For example, Mr. Greenblum did not indicate that there was a likelihood of a mass exit of other employers from the fund given CFS's withdrawal, that the fund was likely to purchase annuities to safeguard against such an eventuality, or that the Fund now needed to shift to a more conservative investment strategy.   Despite CFS's withdrawal, Mr. Greenblum did not indicate that the anticipated experience under the plan was different than its present experience, where he assumed a 7.5% rate of return.   As the Sixth Circuit explained, "PBGC rates are used to determine the present value of future liabilities for plans that are terminated by a 'mass withdrawal,' which occurs when all employers completely withdraw from a multiemployer plan."   *Sofco Erectors*, 15 F.4th at 420 (citations omitted).   In such circumstances, "the plan must purchase annuities to cover the promised benefits unless the plan assets can be distributed 'in full satisfaction' of all covered benefits."   *Id*. at 421 (quoting 29 U.S.C. § 1341a(c)(2)).   By using the PBGC rates as part of a Segal Blend, the fund actuary "is factoring in an interest rate used for plans that essentially go out of business, even though these plans are neither going out of business nor required to purchase annuities to cover the departing employer's share of vested benefits."   *Id*.; *see also N.Y. Times*, 303 F. Supp. 3d at 256.   Here, as in *Sofco Erectors,* the fund actuary improperly relied on circumstances he did not anticipate would occur and looked "to assets that the fund has not indicated it will ever purchase, rather than the fund's actual portfolio. . . and [ ] factor[ed] in rates mandated by the PBGC in other contexts."   *Sofco Erectors*, 15 F.4th at 421 (internal citation

19

omitted).   This is improper under 29 U.S.C. § 1393(a) because it is not based, as the statute requires, on the actuary's "anticipated experience under the plan."   29 U.S.C. § 1393(a)(1).   In fact, the "experience" under the Plan was much different than the PBGC rate and the actuary cited nothing to suggest that the "anticipated" experience after CFS's withdrawal would vary.   *Sofco Erectors*, 15 F.4th at 422 ("Nothing in our cases suggests that actuaries may disregard the statute's requirement that they base their estimates on the 'anticipated experience under the plan.'" (quoting 29 U.S.C. § 1393(a)(1))).

The Court finds persuasive the Sixth Circuit's statutory analysis and explanation as to how a fund actuary treating a single employer's withdrawal as a risk transfer or one-time settlement contravenes the statutory language even if the actuary complies with actuarial standards.   *Id*. at 422-23 ("The Fund next argues that treating a withdrawal as a one-time settlement is an 'accepted actuarial practice,' as reflected in Actuarial Standard of Practice No. 27 § 3.9.   That seems to be true.   But ERISA does not yield to the Actuarial Standards of Practice; the standards must succumb to the statutory requirements.").   Because the arbitrator clearly erred in finding that the Fund actuary's assumptions were reasonable under the statute, the Court will grant summary judgment on this issue to CFS.

### B.  Laches and the Date for the Withdrawal

The next two issues are closely related and are therefore addressed together. CFS argues, in the alternative, that either the Fund unreasonably delayed serving its notice of withdrawal liability by more than five years after March 31, 2013, when the last collective bargaining agreement expired, or that the date of withdrawal was incorrect

and instead should be the 2018 date of decision in *N.L.R.B.*, 891 F.3d. 1031.   Docket No. 41 at 15, 18.   CFS does not seek summary judgment on both issues and, instead, seeks a determination on the issue of the date of withdrawal only if it is denied summary judgment on laches.   *Id*. at 19.

 CFS argues that there is a conflict between the arbitrator's determination that the collective bargaining agreement expired in 2013 and his rejection of the laches defense. *Id*. at 18.   CFS claims that "[k]eeping the withdrawal date close to the time when appeals are completed and the Parties have obtained a final decision on whether a withdrawal occurred would prevent Defendant from being able to obtain a benefit from both Parties' uncertainty about whether a withdrawal occurred."   *Id*. at 19.   CFS argues that the alternative "would give pension plans a perverse incentive to wait as long as possible before serving a notice of withdrawal liability so that they could increase the total withdrawal liability."   *Id*.

 On the issue of laches, CFS argues that the Fund's failure to serve its notice of withdrawal liability until after the D.C. Circuit's ruling, rather than serving it during the pendency of that dispute, was an unreasonable delay.   *Id*. at 15.   CFS disputes the portion of the arbitrator's ruling stating that it was "not possible to send a notice and demand for withdrawal liability without knowing the date of complete withdrawal."   *Id*. (quoting Docket No. 41-6 at 12).   CFS maintains that the arbitrator is incorrect because ERISA, as amended by the MPPAA, "allows for a fund to demand interim payments" notwithstanding any request for review or appeal of the amount of withdrawal liability under 29 USC § 1399(c)(2).   *Id*. at 16.   CFS also notes that the Fund completed an analysis of withdrawal liability in 2015 and, as a result, the Fund could have sent a

notice of withdrawal liability and demanded interim payments at that time.   *Id*. at 5, ¶ 19.

Defendants respond that the date of withdrawal is set by statute and that, in view of the N.L.R.B. decision, 891 F.3d 1031, the date is necessarily the March 31, 2013 expiration of the collective bargaining agreement.   Docket No. 48 at 17-19.   Regarding laches, defendants respond that the Fund was precluded from assessing withdrawal liability during the dispute between CFS and the Union because, under 29 U.S.C. § 1398, "an employer shall not be considered to have withdrawn from a plan" solely based on suspending contributions "during a labor dispute."   *Id*. at 13-14.   Thus, defendants contend that it was proper for them to wait for the completion of the labor dispute between the Union and CFS before serving a notice of withdrawal liability.

In reply, CFS does not dispute defendants' interpretation of 29 U.S.C. § 1398(2) or that its litigation against the Union was a "labor dispute" within the meaning of the statute that prevented CFS from being considered to have withdrawn.   Docket No. 50 at 8-9.   But CFS argues that, if defendants are correct, the ongoing labor dispute therefore shows that CFS cannot have been found to have withdrawn until 2018 when its obligations were determined.   *Id*. at 9.

The Court finds that the relevant statutes prevent a demand for withdrawal liability during the pendency of a labor dispute, while simultaneously allowing the withdrawal date to relate back to the cessation of payments.   *See I.A.M. Nat'l Pension Fund, Plan A, A Benefits v. Fraser Shipyards, Inc.*, 698 F. Supp. 326, 330-331 (D.D.C. 1988).   Section 1398 of Title 29 serves to prevent funds from demanding withdrawal liability as a weapon in labor disputes.   *Id*. at 330 (discussing cases and legislative

history).   One subject of the labor dispute here was whether CFS had the ability to permanently withdraw from the collective bargaining agreement and plan without further payments and negotiation.   *N.L.R.B.*, 891 F.3d. at 1035.   Had the case come out the other way, CFS would have been required to maintain the status quo by making payments to the Fund during negotiations.   *Id.* (discussing *N.L.R.B. v. Katz*, 369 U.S. 736, 743 (1962)).   This, in turn, would have changed the date of CFS's complete withdrawal because CFS would have continued to have contribution obligations.   29 U.S.C. § 1383.   That CFS was not "considered to have withdrawn" under 29 U.S.C. § 1398 during the labor dispute does not prevent the statutory withdrawal date from ultimately being the earlier date.   Rather, "where a legitimate labor dispute has ended without a resumption of contributions, the date of withdrawal relates back to the date of initial cessation."   *Fraser Shipyards, Inc.*, 698 F. Supp. 326 at 331.

Such relation back is consistent with the statute.   The relevant statutory language establishes that a "complete withdrawal from a multiemployer plan occurs when an employer—(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan."   29 U.S.C. § 1383(a).   Subsection (2) and the related provisions of 29 U.S.C. § 1383(b) do not apply in this case because it is undisputed that CFS continued to perform "covered operations under the plan," namely, installation and servicing of sprinkler systems. Docket No. 41-6 at 5 n.3.   Thus, the sole issue is when CFS permanently ceased to have an obligation to contribute to the Fund.   The date that CFS's obligations ceased is the date the collective bargaining agreement expired and CFS did not have an obligation to make continuing payments while negotiating a new contract.   29 U.S.C.

§ 1383(a).   The D.C. Circuit's decision in *N.L.R.B.*, 891 F.3d. 1031, resolved this issue by holding that the final collective bargaining agreement was a Section 8(f) pre-hire agreement that did not require further payments or negotiations.   *N.L.R.B.*, 891 F.3d. at 1041.   Thus, by statute and in accordance with the D.C. Circuit's holding, the expiration of the collective bargaining agreement on March 31, 2013 was the date of CFS's complete withdrawal under 29 U.S.C. § 1383(a) because CFS no longer had an obligation to contribute as of that date.   CFS's policy concern that relation back of the withdrawal date result would provide perverse incentives are of no moment in light of the statutory language and the method by which withdrawal liability is calculated. CFS's request for summary judgment on the withdrawal date issue will be denied.

The Court is not persuaded by CFS's arguments regarding laches.   CFS's interpretation of the relevant statutory provisions and application of laches would have required the Fund to prematurely demand withdrawal payments while there was an ongoing labor dispute between CFS and the Union or risk losing the ability to collect withdrawal liability.   The statutory scheme is set up to allow (and in some cases require) labor disputes to be resolved first, at least in these circumstances.   Laches bars a claim when there is: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."   *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1091 (10th Cir. 2014) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002)).   Ultimately, regardless of whether the Fund could have served a notice of withdrawal liability earlier based on CFS's litigation position or the Fund undertook the analysis before the resolution of the labor dispute, these possibilities do not render the Fund's delay "inexcusable,"

24

"unreasonable," or "undue" such that the lack of diligence element of laches would be satisfied.   *Id.* (citations omitted).   As the arbitrator found, it was reasonable and excusable in the circumstances here for the Fund to wait until resolution of the ongoing labor dispute and the Fund did not delay unreasonably in providing notice of withdrawal liability shortly after the D.C. Circuit's decision.   The Court will deny CFS's request for summary judgment on the issue of laches as well.

### C. Procedural Errors During Arbitration

CFS's final request for summary judgment lacks merit.   CFS asserts, based on an affidavit of counsel, that the arbitrator failed to file an oath and to record the place, time, and date of the hearings in violation of Section 24 of the American Arbitration Association's Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes.   Docket No. 41 at 19-20.[6]   Defendants respond by pointing to the arbitrator's September 7, 2021 Award and Opinion, which states that the arbitrator filed his oath on January 22, 2019 and that the "place, time, and date of the hearings, as well as the presence of counsel and the parties are recorded in the four volumes of transcripts." Docket No. 50 at 9-10; Docket No. 41-7 at 3 n.1; *see also* Docket No. 47-4 at 15 (hearing transcript noting appearances).   Summary judgment on this issue will be denied.

---

[6]  Docket No. 41-5 at 10 ("Section 24. Order of Proceedings—A hearing shall be opened by the filing of the oath of the Arbitrator and by the recording of the place, time and date of the hearing, the presence of the Arbitrator and parties, and counsel, if any, and by the receipt by the Arbitrator of the statement of the claim and answer, if any.").

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that plaintiff's Motion for Summary Judgment [Docket No. 41] is **GRANTED in part** and **DENIED in part**.   It is further

**ORDERED** that Defendants' Cross Motion for Summary Judgment [Docket No. 47] is **DENIED**.   It is further

**ORDERED** that judgment shall enter in favor of plaintiff and against defendants on Count One of plaintiff's Complaint.   It is further

**ORDERED** that this matter is remanded to the arbitrator for proceedings consistent with this Order as to Count One of the complaint.   It is further

**ORDERED** that this matter is closed.

DATED March 26, 2024

.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge